IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE A. OLIVERAS, individually and as Administratrix of the ESTATE OF FRANK W. OLIVERAS, | : : : : | No. 2:26-cv-80 |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| WAYNE COUNTY, WARDEN RANDAL W. WILLIAMS, WAYNE MEMORIAL COMMUNITY HEALTH CENTERS, WAYNE MEMORIAL HOSPITAL, SHC SERVICES, INC. D/B/A SUPPLEMENTAL HEALTH SERVICES, LISA MILLER, NP, CAROLINE SHIFLER, RN, KIMBERLY BLASI, RN, TERRI BIANCHI, RN, JOHN AND JANE DOES 1-10, and JACK AND JILL ROES 1-10, | : : : : : : : : : : : : : | |
| Defendants. | : : : | |

## COMPLAINT

Plaintiff, Christine A. Oliveras, individually and as Administratrix of the Estate of Frank W. Oliveras, by and through her counsel, STROKOVSKY, LLC, hereby files this Complaint and alleges as follows:

## INTRODUCTION

1.      Frank Oliveras tragically fell victim to the deliberate indifference, medical malpractice, and unconstitutional conditions that pervade the Wayne County Correctional Facility ("WCCF"). Frank entered WCCF with significant, well-documented medical conditions, including serious cardiac and respiratory illnesses for which he

required regular and ongoing medical treatment. Absent routine medical care, Frank was medically fragile and at an elevated risk of serious harm; risks that were exacerbated by confinement in a facility that was mold-infested, chronically understaffed, inadequately trained, and devoid of competent medical professionals capable of addressing his complex medical needs.

2.      During his incarceration, Frank's exposure to pervasive mold throughout WCCF was a significant contributing factor to his pneumonia diagnosis, placing him at grave risk given his underlying medical diagnoses. His condition was further worsened by continued exposure to those same hazardous conditions. After being diagnosed with pneumonia, Frank's health rapidly deteriorated. He suffered multiple seizures that caused loss of consciousness and resulted in head injuries, yet he was *never* transported to a hospital for evaluation or treatment. Even more alarming, Frank began experiencing severe respiratory distress and repeated episodes of hypotension and hypertension. His oxygen saturation dropped to dangerously low levels, rendering him hypoxic and placing him in an emergent medical state. Despite these unmistakable signs of medical crisis, Frank was never sent to a hospital.

3.      Frank ultimately died from pneumonia inside WCCF, having been denied the medical care his condition plainly required. He is survived by his wife and 3 daughters, one of whom is completely disabled and for whom Frank served as the primary caretaker.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, and Pennsylvania law. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343.

5.      All claims herein arose within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania and involve Defendants acting under color of law and who reside or conduct business within its jurisdictional limits. Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and (c).

## PARTIES

6.      Frank W. Oliveras was an adult individual who resided in Hawley, Wayne County, Pennsylvania.

7.      Christine A. Oliveras is the wife of Frank W. Oliveras who resides in Hawley, Wayne County, Pennsylvania and was appointed Administratrix of his Estate by the Wayne County Register of Wills.

8.      Wayne County (the "County") is a county government organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 925 Court Street, Honesdale, PA 18431. The County operates WCCF at 44 Mid Wayne Drive, Honesdale, PA 18431. At all relevant times, the County was acting by and through its duly authorized employees, agents and/or administrators of WCCF, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with the County's policies, practices and customs. The County supplies medical services and personnel at WCCF such as licensed practical

nurses, registered nurses, licensed practical nurses, nurse practitioners, physicians, and mental health specialists among others. The County also supplies custodial staff to WCCF for safety and security purposes. The County intentionally puts itself into a position to understand, control, and supervise both medical and custodial needs at WCCF.

9.    At all relevant times, all physicians, behavioral health specialists, clinical providers, physician assistants, psychologists, psychiatrists, and other healthcare personnel who observed, cared for and/or treated Frank Oliveras at WCCF were the agents, ostensible agents, servants, representatives, and/or employees of Wayne County, and were acting while in and upon the business of Wayne County and while in the course and scope of their employment.

10.    Warden Randal W. Williams ("Warden Williams") is an adult individual who, at all relevant times, was employed by the County as WCCF's Warden. At all relevant times, Warden Williams was acting under color of state law through his employment with the County and acting within the course and scope of his duties. Warden Williams had final policymaking authority for WCCF and the County and was responsible for overseeing all operations at WCCF including the provision of healthcare to inmates, and approving and adopting policies and procedures among others. Warden Williams is sued in his individual capacity.

11.    The County and Warden Williams are collectively referred to as the "Municipal Defendants."

12.    SHC Services d/b/a Supplemental Health Care ("SHC") is a Utah corporation with a principal place of business at 6955 Union Park Center, Suite 400, Cottonwood Heights, UT 84047. At all relevant times, SHC was acting by and through its duly authorized employees, agents, and/or administrators, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs. At all relevant times, SHC contracted with the County to recruit and staff health care personnel at WCCF. All employees recruited and staffed by SHC are SHC's agents, ostensible agents, servants, representatives, and/or employees, and were acting while in and upon the business of SHC and while in the course and scope of their employment.

13.    The professional liability claims asserted against SHC are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Frank at WCCF. The professional liability claims being asserted against them include direct claims for corporate negligence. SHC had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

14.    Wayne Memorial Community Health Centers ("WMCHC") is a Pennsylvania non-profit federally qualified health center with its principal place of business at Park and West Streets, Honesdale, Wayne County, Pennsylvania 18431. WMCHC operates a network of community-based outpatient clinics providing primary care, preventive services, and routine management of chronic medical conditions, and does not function as an acute-care hospital or provide inpatient or emergency services.

5

Upon information and belief, WMCHC is owned, operated, managed, and/or controlled by Wayne Memorial Health System, Inc., or a related corporate entity, and at all relevant times shared common ownership, management, policies, and procedures with WMCHC, and acted through its employees, agents, and contracted medical providers, all of whom were acting within the course and scope of their employment or agency.

15.     The professional liability claims asserted against WMCHC are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Frank at WCCF. The professional liability claims being asserted against them include direct claims for corporate negligence. WMCHC had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

16.     Wayne Memorial Hospital ("Wayne Memorial"), is a Pennsylvania non-profit health-care corporation with its principal place of business at 601 Park Street, Honesdale, Wayne County, Pennsylvania. Wayne Memorial is a licensed acute-care hospital authorized to provide inpatient and outpatient medical services, including emergency medical care, diagnostic testing, and treatment of serious and emergent medical conditions. Upon information and belief, Wayne Memorial is owned, operated, and/or controlled by Wayne Memorial Health System, Inc., or an affiliated parent entity, and at all relevant times exercised ownership, control, and supervisory authority over its officers, employees, agents, and medical staff, all of whom were acting within the course and scope of their employment or agency.

6

17.     The professional liability claims asserted against Wayne Memorial are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Frank at WCCF. The professional liability claims being asserted against them include direct claims for corporate negligence. Wayne Memorial had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

18.     Lisa Miller, NP is an adult individual who, at all relevant times, was employed by Wayne Memorial and/or Wayne WMCHC to exclusively practice as a nurse practitioner and acting within the course and scope of her duties. NP Miller is an agent, ostensible agent, servant, representative, and/or employee of Wayne Memorial and/or WMCHC. At all relevant times, NP Miller was acting under color of state law through her employment to provide medical care at WCCF, and in accordance with the policies, customs, and/or practices of the County. NP Miller is sued in her individual capacity.

19.     Caroline Shifler, RN ("Nurse Shifler") is an adult individual who, at all relevant times, was employed by SHC and/or the County to exclusively practice as a nurse at WCCF and acting within the course and scope of her duties. At all relevant times, Nurse Shifler was acting under color of state law through her employment to provide medical care at WCCF, and in accordance with the policies, customs, and/or practices of the County. Nurse Shifler is sued in her individual capacity.

20.     Kimberly Blasi, RN ("Nurse Blasi") is an adult individual who, at all relevant times, was employed by SHC and/or the County to exclusively practice as a nurse at WCCF and acting within the course and scope of her duties. At all relevant times, Nurse Blasi was acting under color of state law through her employment to provide medical care at WCCF, and in accordance with the policies, customs, and/or practices of the County. Nurse Blasi is sued in her individual capacity.

21.     Terri Bianchi, LPN ("LPN Bianchi") is an adult individual who, at all relevant times, was employed by SHC and/or the County to exclusively practice as a nurse at WCCF and acting within the course and scope of her duties. At all relevant times, LPN Bianchi was acting under color of state law through her employment to provide medical care at WCCF, and in accordance with the policies, customs, and/or practices of the County. LPN Bianchi is sued in her individual capacity.

22.     John and Jane Does 1-10 are unknown adult individuals who, at all relevant times, were employed by SHC and/or Wayne Memorial and/or WMCHC and/or the County to exclusively practice as medical providers at WCCF and acting within the course and scope of their duties. At all relevant times, John and Jane Does 1-10 were acting under color of state law through their employment to provide medical care at WCCF, and in accordance with the policies, customs, and/or practices of the County. John and Jane Does 1-10 are sued in their individual capacities.

23.     SHC, Wayne Memorial, WMCHC, NP Miller, Nurse Shifler, Nurse Blasi, LPN Bianchi, and John and Jane Does 1-10 are collectively referred to as the "Medical Defendants."

24.     Jack and Jill Roes 1-10 are unknown adult individuals who, at all relevant times, were employed by the County as corrections officers at WCCF and acting within the course and scope of their duties. At all relevant times, Jack and Jill Roes 1-10 were acting under color of state law, and in accordance with the policies, customs, and/or practices of the County and WCCF. Jack and Jill Roes 1-10 are sued in their individual capacities.

### FACTS

25.     On or about October 26, 2024, Frank Oliveras, 65 years old, was committed to WCCF.

26.     Frank was a pretrial detainee at all relevant times.

27.     At the time of Frank's incarceration, WCCF was significantly understaffed in both correctional and medical personnel.

28.     Upon his entry to WCCF, Frank had significant health conditions including multiple sclerosis, chronic obstructive pulmonary disease, coronary artery disease, pulmonary fibrosis, hyperlipidemia, type II diabetes, hypertension, chronic lumbar and cervical spine pain, spinal stenosis, and 2 previous heart attacks with a cardiac stent placement among others.

29.     At the time of Frank's admission, WCCF was infiltrated with mold w the County was aware of for years.

30.     It is well known that mold exposure can cause pneumonia through several well-recognized medical mechanisms.

31.     Certain molds, such as *Aspergillus*, can directly infect the lungs and produce a true fungal pneumonia, particularly in individuals with compromised immune systems or underlying lung disease.

32.     Mold exposure can also trigger hypersensitivity pneumonitis, an intense immune-mediated inflammatory reaction within the lung tissue that produces symptoms and radiographic findings that closely resemble pneumonia, including shortness of breath, cough, fever, and impaired oxygenation.

33.     In addition, mold spores and mycotoxins can irritate and inflame the airways, worsening conditions such as COPD or asthma, which in turn weakens pulmonary defenses and makes the lungs more susceptible to secondary bacterial pneumonia.

34.     For these reasons, significant or prolonged mold exposure is a medically recognized risk factor for the development of pneumonia, especially in vulnerable individuals or those with preexisting cardiopulmonary disease.

35.     On or about January 16, 2025, Frank received a mobile chest X-Ray at WCCF after new shortness of breath complaints which revealed acute lingular pneumonia.

36.     Lingular pneumonia requires hospital-level care in high-risk patients such as Frank because infection in the lingula often impairs ventilation disproportionately and can rapidly progress to hypoxia, respiratory distress, and cardiopulmonary instability.

37.     The lingula functions similarly to the right middle lobe and is prone to poor aeration and mucus retention, making pneumonias in this region more likely to worsen without aggressive monitoring and treatment.

10

38.     In patients with COPD, cardiac disease, or limited physiologic reserve like Frank, even a moderate lingular pneumonia can create significant ventilation–perfusion mismatch and sudden drops in oxygen saturation.

39.     These patients may also experience bronchospasm, atelectasis, or increased work of breathing, which cannot be safely managed outside a hospital environment.

40.     Proper evaluation of lingular pneumonia requires diagnostics and interventions unavailable in a jail setting such as WCCF, including serial chest imaging, continuous pulse oximetry, arterial blood gases, telemetry, high-flow oxygen, nebulizer therapy, and rapid escalation to BiPAP or mechanical ventilation if the patient deteriorates.

41.     Because lingular pneumonia in a medically vulnerable patient carries a well-recognized risk of rapid decompensation, the standard of care mandates hospital transfer for close respiratory monitoring, timely antibiotic administration, and immediate intervention if respiratory failure or cardiac complications develop.

42.     For these medical reasons, the coexistence of cardiac disease, COPD, and acute pneumonia is well-recognized as a high-mortality condition, and pneumonia in this setting is a direct and foreseeable cause of respiratory failure, cardiac collapse, and death.

43.     However, the Medical Defendants did not transfer Frank to the hospital, he remained at WCCF.

44.     Instead, NP Miller entered an order for Frank to receive albuterol via a nebulizer twice per day and a high dose of antibiotics which was completely insufficient to treat his acute lingular pneumonia given his comorbidities.

45.     At this point it was obvious to NP Miller that Frank needed emergency medical attention and a higher level of care that WCCF could not provide, but she was deliberately indifferent to his emergent medical needs.

46.     Notwithstanding, the Medical Defendants either administered Frank albuterol once per day, or not at all throughout the remainder of his incarceration at WCCF.

47.     On the same day as his pneumonia diagnosis, Frank reported to LPN Bianchi that he suffered a seizure.

48.     Seizures are commonly triggered by pneumonia because of diminished oxygen levels that impair brain function and lower the seizure threshold.

49.     Indeed, at this time, Frank was hypotensive with diminished peripheral oxygen saturation.

50.     At this point it was obvious to LPN Bianchi that Frank needed emergency medical attention, but she was deliberately indifferent to his emergent medical needs.

51.     Frank's condition continued to deteriorate.

52.     On January 19, 2025, at or around 6 a.m., Frank was seen by Nurse Shifler with shortness of breath and wheezing complaints.

53.     At this time, Frank's peripheral oxygen saturation was 94% without oxygen which is considered borderline hypoxic.

12

54.    Nurse Shifler only administered Frank albuterol via a nebulizer and documented that they would contact "Dr." for further orders although she did not document that she spoke with a doctor regarding Frank's condition.

55.    At this point it was obvious to Nurse Shifler that Frank needed emergency medical attention, but she was deliberately indifferent to his emergent medical needs.

56.    A few hours later, at or around 9:35 a.m., Frank fell from his bed and sustained a head injury in the form of a "moderate sized goose egg" on his forehead and a bruise on his right cheek as documented by Nurse Shifler.

57.    At this time, Frank's blood pressure was 130/74 which is considered stage 1 hypertensive.

58.    The onset of hypertension in a patient diagnosed with pneumonia is a concerning clinical indicator that requires escalation of care and a hospital transfer given Frank's comorbidities.

59.    In the setting of pneumonia, rising blood pressure reflects significant physiologic stress caused by hypoxia, respiratory distress, and increased cardiac workload.

60.    This sympathetic surge can precipitate arrhythmias, myocardial ischemia, or acute heart failure, risks that are especially severe in individuals with underlying cardiac or pulmonary disease.

61.    Correctional facilities such as WCCF are not equipped to provide the continuous monitoring, serial blood gases, advanced imaging, or rapid respiratory support needed to evaluate and stabilize a patient showing these signs of deterioration.

13

62.     Because hypertension in the context of active pneumonia indicates potential cardiopulmonary instability and impending decompensation, the standard of care requires transfer to a hospital where the patient can receive high-level medical assessment, telemetry, and immediate intervention if respiratory or cardiac failure occurs.

63.     However, when Nurse Shifler contacted NP Miller to inform her of Frank's condition and to seek further direction regarding his treatment, NP Miller only instructed Nurse Shifler to continue to monitor Frank.

64.     At this point it was obvious to NP Miller and Nurse Shifler that Frank needed emergency medical attention, but they were deliberately indifferent to his emergent medical needs.

65.     Later that morning, at or around 11 a.m., Frank informed Nurse Shifler that he could not breathe.

66.     At this time, Frank's peripheral oxygen saturation was significantly diminished at 80% which is consistent with hypoxia and was a red flag that Frank's pneumonia was significantly impairing his lung function.

67.     Frank should have been immediately transferred to the hospital for evaluation and treatment.

68.     However, when Nurse Shifler called NP Miller to inform her of Frank's condition, she once again instructed Nurse Shifler to monitor him and continue oxygen.

69.     The only oxygen available at WCCF is 3L/min via cannula which was completely insufficient to treat Frank's hypoxia.

70.    3L/min of supplemental oxygen is a *low-flow* oxygen dose that provides only a modest increase in inspired oxygen concentration.

71.    In a patient who is already hypoxic like Frank, this level of support is generally inadequate because it cannot overcome the impaired gas exchange caused by conditions such as pneumonia, COPD exacerbation, or cardiac decompensation.

72.    Hypoxia in these settings reflects significant alveolar inflammation, consolidation, or ventilation–perfusion mismatch; problems that require substantially higher oxygen delivery, often through high-flow nasal cannula, noninvasive positive-pressure ventilation, or even intubation.

73.    When a patient is experiencing moderate to severe hypoxia, low-flow oxygen like 3L/min fails to restore adequate oxygen saturation or address the underlying respiratory failure.

74.    The standard of care requires escalating oxygen therapy based on the patient's clinical status, and reliance on only 3L/min in a deteriorating or severely hypoxic patient places them at risk of continued hypoxia, cardiac strain, organ dysfunction, and respiratory collapse.

75.    Again, at this point it was obvious to NP Miller and Nurse Shifler that Frank needed emergency medical attention, but they were deliberately indifferent to his emergent medical needs.

76.    On January 27, 2025, because of Frank's deteriorating medical condition, Nurse Shifler transferred Frank to WCCF's medical housing unit on a bottom bunk.

77.     However, because WCCF was so short staffed in both medical and corrections staff, an inmate was assigned to supervise Frank while he weas housed in the medical isolation housing unit.

78.     Consequently, Jack and Jill Roes 1-10 did not monitor Frank every 15 minutes as they were required to do under WCCF's policies and procedures for inmates housed in its medical isolation housing unit although they documented that they did.

79.     On January 30, 2025, Frank complained to his inmate supervisor that he was experiencing tightness in his lungs which the inmate supervisor communicated to Nurse Blasi.

80.     Upon evaluation, Nurse Blasi noted wheezing in Frank's lungs, but did not test Frank's peripheral oxygen saturation.

81.     Instead, Nurse Blasi administered Frank albuterol via a nebulizer and then proceeded to test his $SpO_2$ which was *then* within normal limits.

82.     However, an albuterol nebulizer can produce a short-term improvement in a patient's oxygen saturation by relieving bronchospasm and temporarily opening the airways, but this increase in $SpO_2$ does not mean the underlying disease process has resolved or that the patient is clinically stable.

83.     In conditions such as pneumonia or COPD exacerbation, the primary problem is impaired gas exchange caused by inflammation, consolidation, or ventilation—perfusion mismatch—issues that albuterol cannot fix.

84.     As a result, the post-nebulizer rise in $SpO_2$ simply reflects improved airflow, not improved oxygenation capacity.

85.    This effect is transient and often fades within minutes to an hour, and patients can quickly return to hypoxic levels if the underlying pathology is not aggressively treated.

86.    For this reason, a brief improvement in $SpO_2$ after a nebulizer treatment cannot be relied upon to assess stability, cannot substitute for hospital-level diagnostics, and does not eliminate the need for transfer when the overall clinical picture remains high risk or clinically concerning.

87.    More importantly, Frank's blood pressure was 110/60.

88.    In the context of an active infection, this low-normal blood pressure was a clinically significant warning sign of physiologic stress and potential early sepsis, requiring further evaluation, monitoring, and escalation of care.

89.    Despite this objective indicator of deterioration, Nurse Blasi failed to reassess Frank, trend vital signs, order diagnostic testing, initiate appropriate treatment, or transfer Frank to a higher level of care.

90.    Nurse Blasi's failure to respond to this documented warning sign constituted deliberate indifference to Frank's serious medical needs and directly contributed to Frank's worsening condition, prolonged suffering, and ultimate death.

91.    On January 31, 2025, at or around 1:55 p.m., Nurses Shifler and Blasi were called to Frank's housing unit because he was "not acting right."

92.    Upon their arrival, Nurses Shifler and Blasi observed Frank sitting on his bed leaning against the wall unresponsive.

93.     Despite resuscitation efforts from these defendants and paramedics, Frank would not regain a pulse.

94.     The Wayne County medical examiner concluded that Frank's cause of death was heart failure secondary to pneumonia.

95.     Throughout the course of Frank's incarceration at WCCF, his family routinely called the jail to request that Frank be transferred to the hospital which Defendants refused to do and is reflected in the Wayne County medical examiner's report.

96.     What is more, several inmates petitioned Defendants to transfer Frank to the hospital which they likewise ignored.

97.     Had Defendants timely transferred Frank to an acute-care hospital when he developed pneumonia, exhibited hypoxia, hypertension or shortness of breath, or suffered strokes, Frank would, to a reasonable degree of medical certainty, have survived.

98.     Defendants' acts and omissions were a direct and proximate cause of Frank's conscious pain and suffering, rapid clinical deterioration, and ultimate death.

99.     As a direct and proximate result of Defendants' acts and omissions, including their negligent, reckless, and/or deliberately indifferent conduct, Frank suffered significant conscious pain and suffering prior to death.

100.    During this period, Frank experienced severe physical pain, emotional distress, fear, anxiety, and mental anguish, including the awareness of impending harm and death.

101.    Defendants' conduct deprived Frank of necessary care, protection, and humane treatment, exacerbating Frank's suffering and prolonging physical and psychological distress.

102.    Such pain and suffering were substantial, foreseeable, and unnecessary, and were directly caused by Defendants' wrongful conduct, entitling Frank's Estate to recover damages under Pennsylvania's Wrongful Death and Survival statutes.

103.    Frank is survived by his wife and 3 daughters.

**COUNT I**
**Failure to Train or Supervise**
**or, in the Alternative, Failure to Adopt Policy**
**Under 42 U.S.C. § 1983**
**(As to the Municipal Defendants)**

104.    All paragraphs herein are incorporated by reference.

105.    The Municipal Defendants inflicted unnecessary and wanton pain upon Frank by directing and maintaining a custom, practice, or policy of not adopting a policy or procedure to address the immediate and/or emergency medical concerns of incarcerated persons, including those with cardiac and pulmonary disease, under their care and custody.

106.    The absence of any policy in this regard caused Frank—who had to rely upon jail authorities to treat his medical needs—to suffer from actual physical torture that culminated in his slow, painful and lingering death.

107.    The absence of any policy in this regard caused Frank to needlessly suffer from pneumonia and related complications, which was easily treatable through proper monitoring, until he finally died from pneumonia.

108.    The absence of any policy in this regard caused there to be no mechanism through which medical staff and/or jail officials had guidance on how, when, and why to treat incarcerated persons' complaints for emergency and/or immediate medical care.

109.    The absence of any policy in this regard caused a needless denial and delay of access to appropriate (or any) medical care, such as proper clinical responses, assessments, examinations, and diagnostic testing to incarcerated persons with serious medical needs.

110.    The absence of any policy in this regard shows deliberate indifference to a pretrial detainee's serious illnesses who is under the care and custody of the WCCF (like Frank) and was the moving force behind Frank's death.

111.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Frank by failing to train the Medical Defendants and Jack and Jill Roes 1-10 on at least the following:

a.    assessing the immediate and/or emergency medical concerns of incarcerated persons, including those with pulmonary and cardiac disease, under their care and custody,

b.    treating the immediate and/or emergency medical concerns of incarcerated persons, including those with pulmonary and cardiac disease, under their care and custody,

c.    ensuring the immediate and/or emergency medical concerns of incarcerated persons, including those with pulmonary and cardiac disease, under their care and custody,

d.    communicating among medical and correctional staff on the care, assessment and evaluation of incarcerated persons under their care and custody,

e.    reporting medical concerns of incarcerated persons through the chain of command,

f.    identifying complications in inmates associated with pulmonary and cardiac disease,

g.    tracking incarcerated persons' responses to prescribed medical regimens, and/or

  h. providing proper oversight of medical regimens.

112. In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Frank by failing to supervise the Medical Defendants and Jack and Jill Roes 1-10 in at least the following ways:

  a. by understaffing the medical staff at the WCCF,

  b. by failing to implement and/or enforce policies whereby the medical staff responds to medical requests,

  c. by failing to ensure appropriate diagnostic testing when necessary or applicable,

  d. by failing to ensure that diagnostic testing is carried out when ordered,

  e. by failing to ensure that prescribed medical requests and regimens were implemented,

  f. by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with cardiac and pulmonary disease,

  g. by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with cardiac and pulmonary disease,

  h. by failing to ensure that correctional policies and procedures do not conflict, restrict, and/or deny healthcare of incarcerated persons,

  i. by failing to ensure that punitive measures were not used in response to requests for medical or mental healthcare,

  j. by failing to ensure that medical or mental healthcare staff were able to interrupt the use of punitive measures where appropriate,

  k. by failing to conduct adequate mortality reviews to assess whether compliance indicators were being met or inconsistent in how they are being delivered, documented, or communicated,

  l. by failing assess adverse clinical events or near-miss clinical incidents and inform correctional and medical staff of incidents that occurred because of errors attributed to medical management or near-miss events which were preventable,

  m. by failing to assess correctional and medical staff's response to emergency or man-down drills to identify and critique gaps before actual incidents occurred,

  n. by failing to ensure adequate communication among hospital and correctional and medical staff to ensure adequate notification and understanding of the severity of incarcerated persons' medical condition and needs and timely procurement and preparation of resources; and/or

    o.    by failing to ensure patients with chronic health conditions were managed using evidence-based clinical treatment practices and that consistent treatment and follow-ups were provided.

113.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Frank by failing to adequately screen during the hiring process medical staff including SHC, WMCHC, and Wayne Memorial contractors for the proper credentials and qualifications, suspensions, or disciplinary action by a state medical board.

114.    The Municipal Defendants know that their medical and correctional staff will confront situations in which incarcerated persons (like Frank) have serious medical needs that could involve a difficult choice, the wrong choice of which would likely cause a constitutional violation.

115.    As stated above, Frank's death could have been avoided had the Municipal Defendants adequately trained or supervised their medical and correctional staff on providing appropriate medical care.

116.    As a result of the Municipal Defendants' deliberate indifference Plaintiff seeks recovery of:

    a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;
    b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;
    c.    Funeral and burial expenses;
    d.    Compensatory damages;
    e.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and
    f.    Any other relief this Court deems just and proper.

## COUNT II
### Denial and/or Delay of Access to Adequate Medical Care
### Under 42 U.S.C. § 1983
### (As to the Medical Defendants and Jack and Jill Roes 1-10)

117.    All paragraphs herein are incorporated by reference.

118.    At all relevant times, Frank was a pretrial detainee and was therefore protected by the Due Process Clause of the Fourteenth Amendment, which guarantees the right to adequate medical care and humane conditions of confinement.

119.    The Medical Defendants and Jack and Jill Roes 1-10 violated Frank's Fourteenth Amendment rights by subjecting him to conduct that was objectively unreasonable under the circumstances and not rationally related to a legitimate governmental purpose.

120.    The Medical Defendants and Jack and Jill Roes 1-10 knew or should have known that their acts and omissions, including the failure to timely transfer Frank to an acute-care hospital, failure to respond appropriately to obvious signs of medical emergency, failure to provide adequate respiratory support, and continued exposure to hazardous environmental conditions, posed a substantial risk of serious harm.

121.    Notwithstanding this risk, the Medical Defendants and Jack and Jill Roes 1-10 failed to take reasonable measures to abate it.

122.    The Medical Defendants and Jack and Jill Roes 1-10's conduct amounted to reckless disregard for Frank's health and safety and resulted in unnecessary pain, suffering, and death.

123.    Such conduct constitutes a violation of Frank's clearly established rights under the Fourteenth Amendment, independent of any showing of subjective intent to punish.

124.    The Medical Defendants and Jack and Jill Roes 1-10's denial and/or delay of medical care to Frank's serious medical needs created a risk of death and did cause Frank's death.

125.    The Medical Defendants and Jack and Jill Roes 1-10 were deliberately indifferent to Frank's serious medical needs by failing to timely and adequately provide him with medical care.

126.    Frank suffered conscious pain and suffering and death because of the Medical Defendants and Jack and Jill Roes 1-10 conduct, which was wanton and willful.

127.    As a result of the Medical Defendants and Jack and Jill Roes' deliberate indifference, Plaintiff seeks recovery of:

      a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;

      b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;

      c.    Funeral and burial expenses;

      d.    Compensatory damages;

      e.    Punitive damages, as the Medical Defendants' conduct was willful, reckless, and in callous disregard of federally protected rights;

      f.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

      g.    Any other relief this Court deems just and proper.

## COUNT III
## Supervisory Liability
## Under 42 U.S.C. § 1983
## (As to Warden Williams)

128.    All paragraphs herein are incorporated by reference.

129.    At all relevant times, and as described in greater detail above, Warden Williams directed his subordinates and/or acquiesced in his subordinates' conduct that he knew was violative of Frank's federal rights.

130.    As a result of Warden Williams' deliberate indifference, Plaintiff seeks recovery of:

   a.   Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;
   b.   Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;
   c.   Funeral and burial expenses;
   d.   Compensatory damages;
   e.   Punitive damages, as Warden Williams' conduct was willful, reckless, and in callous disregard of federally protected rights;
   f.   Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and
   g.   Any other relief this Court deems just and proper.

## COUNT IV
### Negligent Hiring and/or Supervision
### (As to SHC, WMCHC, and Wayne Memorial)

131.    All paragraphs herein are incorporated by reference.

132.    SHC, WMCHC, and Wayne Memorial had a duty to exercise reasonable care in hiring and/or supervising competent employees to provide medical care to incarcerated people at WCCF.

133.    SHC, WMCHC, and Wayne Memorial knew or should have known that the individual Medical Defendants were not competent to provide medical care to incarcerated people at the WCCF, and therefore breached their duty in either hiring them to provide medical care to incarcerated people at WCCF or in failing to supervise them in providing medical care to incarcerated people at WCCF.

134.    As a direct and proximate result of SHC, WMCHC, and Wayne Memorial's conduct, Frank suffered actual physical injury, including death.

135.    As a result of SHC, WMCHC, and Wayne Memorial's negligence, Plaintiff seeks recovery of:

     a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;

     b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;

     c.    Funeral and burial expenses;

     d.    Compensatory damages;

     e.    Punitive damages, as Defendnts' conduct was willful, reckless, and in callous disregard of federally protected rights; and

     f.    Any other relief this Court deems just and proper.

**COUNT V**
**Vicarious Liability**
**(As to SHC, WMCHC, and Wayne Memorial)**

136.    All paragraphs herein are incorporated by reference.

137.    SHC, WMCHC, and/or Wayne Memorial are vicariously liable for the acts, commissions, or omissions of the individual Medical Defendants, and others who acted and/or failed to act as though SHC, WMCHC, and Wayne Memorial performed the acts or failed to perform the acts itself.

138.    SHC, WMCHC, and/or Wayne Memorial are responsible for at least the following negligent acts or omissions of its medical staff, who are their respective agents, ostensible agents, servants, and/or employees, which deviated from the medical standard of care owed to Frank in some or all the following ways:

    a.    Failing to manage his cardiac and pulmonary disease, and pneumonia;
    b.    Failing to identify risk factors relating to his cardiac and pulmonary disease, and pneumonia;
    c.    Failing to identify overall individualized treatment plans for cardiac and pulmonary disease, and pneumonia;
    d.    Failing to implement adequate individualized treatment plans for cardiac and pulmonary disease, and pneumonia;
    e.    Failing to implement individualized treatment interventions;
    f.    Failing to screen for risks associated with the chronically ill as it relates to cardiac and pulmonary disease, and pneumonia;
    g.    Failing to perform evaluations at clinically relevant or critical times;
    h.    Failing to perform comprehensive evaluations on cardiac and pulmonary disease, and pneumonia;
    i.    Failing to consider both risk-enhancing and protective factors;
    j.    Failing to document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment;
    k.    Failing to explore overall needs in managing cardiac and pulmonary disease, and pneumonia;
    l.    Failing to assess the degree of his cardiac and pulmonary disease, and pneumonia; and

m.    Failing to transfer him to an acute-care hospital.

139.    The Medical Defendants' negligence, as well as the negligence of other medical staff employed by SHC, WMCHC, and/or Wayne Memorial, increased the risk of harm to Frank and was a cause in fact to the injuries he suffered and his resultant death.

140.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Frank's rights.

141.    As a result of the negligence of the Medical Defendants' negligence, Plaintiff seeks recovery of:

       a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;

       b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;

       c.    Funeral and burial expenses;

       d.    Compensatory damages;

       e.    Punitive damages, as Defendants' conduct was willful, reckless, and in callous disregard of federally protected rights; and

       f.    Any other relief this Court deems just and proper.

## COUNT VI
## Medical Negligence
## (As to the Medical Defendants)

142.    All paragraphs herein are incorporated by reference.

143.    The Medical Defendants were immediately and directly responsible for providing medical treatment and services for Frank and to provide those services to Frank at WCCF.

144.    At all relevant times, the Medical Defendants had a duty to provide Frank with reasonable medical care for his cardiac and pulmonary disease, and pneumonia among his other conditions.

145.    In providing medical treatment and services to Frank, it was the duty of the Medical Defendants to provide care consistent with the standards of reasonably competent medical providers.

146.    Notwithstanding these duties, the Medical Defendants committed one or more of the following negligent acts or omissions:

    a.    Failing to provide an adequate medical care plan for Frank, including adequate treatment for his cardiac and pulmonary disease, and pneumonia;

    b.    Failing to provide timely and thorough medical examinations of Frank;

    c.    Failing to provide timely and adequately respond to requests for treatment;

    d.    Failing to properly document Frank's cardiac and pulmonary disease, and pneumonia;

    e.    Failure to properly monitor Frank's cardiac and pulmonary disease, and pneumonia;

    f.    Failure to properly monitor risk factors relating to Frank's cardiac and pulmonary disease, and pneumonia;

    g.    Failure to properly implement a communication plan concerning Frank's medical care; and

    h.    Failure to transfer Frank to an acute-care hospital.

147.    As a direct and proximate result of the Medical Defendants' failure to adequately provide medical treatment and care to Frank during his incarceration at WCCF, Frank suffered fatal complications secondary to pneumonia leading to his death.

148.    The Medical Defendants' actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Frank's rights.

149.    As a result of the negligence of the Medical Defendants' negligence, Plaintiff seeks recovery of:

> a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;
> b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;
> c.    Funeral and burial expenses;
> d.    Compensatory damages;
> e.    Punitive damages, as Defendants' conduct was willful, reckless, and in callous disregard of federally protected rights; and
> f.    Any other relief this Court deems just and proper.

## COUNT VII
### Deliberate Indifference
### Under 42 U.S.C. § 1983
### (As to the Medical Defendants and Jack and Jill Roes 1-10)

150.    All paragraphs herein are incorporated by reference.

151.    At all relevant times, Frank was a pretrial detainee and was therefore protected by the Due Process Clause of the Fourteenth Amendment, which guarantees the right to adequate medical care and humane conditions of confinement.

152.    The Medical Defendants and Jack and Jill Roes 1-10 violated Frank's Fourteenth Amendment rights by subjecting him to conduct that was objectively unreasonable under the circumstances and not rationally related to a legitimate governmental purpose.

153.    The Medical Defendants and Jack and Jill Roes 1-10 knew or should have known that their acts and omissions, including the failure to timely transfer Frank to an acute-care hospital, failure to respond appropriately to obvious signs of medical emergency, failure to provide adequate respiratory support, and continued exposure to hazardous environmental conditions, posed a substantial risk of serious harm.

154.    Notwithstanding this risk, the Medical Defendants and Jack and Jill Roes 1-10 failed to take reasonable measures to abate it.

155.    The Medical Defendants and Jack and Jill Roes 1-10 were deliberately indifferent to Frank's serious medical needs by failing to timely and adequately provide him with medical care, or send Frank to the hospital for a higher level of treatment.

156.    Frank suffered conscious pain and suffering and death because of the Medical Defendants and Jack and Jill Roes 1-10's deliberate indifference, which was wanton and willful.

157.    As a result of the deliberate indifference of the Medical Defendants and Jack and Jill Roes 1-10, Plaintiff seeks recovery of:

    a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;

    b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;

    c.    Funeral and burial expenses;

    d.    Compensatory damages;

    e.    Punitive damages, as Defendants' conduct was willful, reckless, and in callous disregard of federally protected rights;

    f.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    g.    Any other relief this Court deems just and proper.

### COUNT VIII
### Unconstitutional Conditions of Confinement
### Under 42 U.S.C. § 1983
### (As to Wayne County)

158.    All paragraphs herein are incorporated by reference.

159.    At all relevant times, Frank was lawfully confined at WCCF, a correctional facility owned, operated, and controlled by Wayne County.

160.    Wayne County, through its policymakers, employees, agents, and contractors, was responsible for establishing, implementing, and enforcing policies, practices, and customs governing the maintenance, sanitation, ventilation, and environmental safety of WCCF.

161.    Frank had a clearly established constitutional right to be confined in humane conditions that did not pose a substantial risk of serious harm to his health or safety, including the right to be free from prolonged exposure to hazardous environmental hazards such as mold.

162. At all relevant times, WCCF was infested with mold and excessive moisture, including visible mold growth in housing areas, walls, ceilings, ventilation systems, and other structural components, resulting in contaminated air and unsanitary living conditions.

163. The mold infestation and resulting air-quality deficiencies constituted an objectively serious condition, posing a substantial risk of serious harm, including respiratory infection, pneumonia, and death.

164. Wayne County and its policymakers knew of and disregarded the substantial risk posed by the mold infestation, as evidenced by, inter alia:

    a.    Prior complaints by inmates and staff regarding mold and respiratory symptoms;

    b.    Knowledge of recurring water intrusion, dampness, and ventilation failures;

    c.    Prior inspections, maintenance reports, grievances, or work orders documenting mold and moisture issues; and/or

    d.    The obvious and longstanding nature of the hazardous conditions.

165. Despite such knowledge, Wayne County failed to take reasonable measures to abate the risk, including failing to adequately remediate mold, repair structural defects, improve ventilation, or remove Frank from the hazardous environment.

166. Wayne County's actions and omissions were deliberately indifferent to Frank's health and safety and amounted to more than mere negligence.

167. As a direct and proximate result of Wayne County's deliberate indifference, Frank was repeatedly and prolongedly exposed to mold-contaminated air, causing him to develop pneumonia and related respiratory illness.

168.    Frank suffered severe physical pain, respiratory distress, fear, anxiety, and conscious suffering as his condition worsened while confined under unconstitutional conditions.

169.    Frank ultimately died from complications of pneumonia, which was caused or substantially exacerbated by the unconstitutional conditions of confinement imposed by Wayne County.

170.    The unconstitutional conditions were caused by official policies, customs, and practices of Wayne County, including but not limited to:

    a.    A policy or custom of inadequate inspection and remediation of environmental hazards;
    b.    A failure to allocate sufficient resources for jail maintenance and sanitation;
    c.    A custom of disregarding known health risks posed by mold; and/or
    d.    A failure to train and supervise personnel regarding environmental health hazards.

171.    Wayne County is therefore liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for the constitutional violations suffered by Frank.

172.    As a result of the deliberate indifference of Wayne County, Plaintiff seeks recovery of:

    a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;
    b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;
    c.    Funeral and burial expenses;
    d.    Compensatory damages;
    e.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and
    f.    Any other relief this Court deems just and proper.

## COUNT IX
## Negligence
## (As to Wayne County)

173.    All paragraphs herein are incorporated by reference.

174.    At all relevant times, Wayne County owned, operated, maintained, and exercised custody and control over WCCF, a correctional facility constituting real property within the meaning of the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541, *et seq*.

175.    Wayne County owed Frank a duty to exercise reasonable care in the ownership, operation, inspection, maintenance, and repair of WCCF, including a duty to maintain the facility in a safe, sanitary, and habitable condition free from hazardous environmental conditions.

176.    At all relevant times, WCCF was infested with mold and excessive moisture, including mold growth within housing units, ventilation systems, walls, ceilings, and/or other structural components of the facility.

177.    The presence of mold constituted a dangerous condition of real property, arising from and directly related to the physical condition, maintenance, and defects of WCCF's structure itself.

178.    Wayne County knew or, in the exercise of reasonable care, should have known of the mold infestation and the serious health risks it posed to incarcerated individuals, including respiratory illness, infection, and pneumonia.

179.    Despite such knowledge, Wayne County negligently failed to:

    a.    Properly inspect WCCF for mold and moisture intrusion;

    b.    Timely remediate known mold infestations;

    c.    Repair structural defects causing water intrusion, dampness, and mold growth;

    d.    Maintain adequate ventilation and air quality;

    e.    Warn Plaintiff of the hazardous condition; and/or

    f.    Take reasonable steps to protect Frank from exposure to mold.

180.    As a direct and proximate result of Wayne County's negligent acts and omissions, Frank was exposed to mold within WCCF.

181.    Said exposure caused or substantially contributed to Frank contracting pneumonia and related respiratory illness, resulting in severe physical pain, respiratory distress, suffering, and declining health.

182.    Frank ultimately died because of complications from pneumonia, which was caused or exacerbated by prolonged exposure to mold and unsanitary environmental conditions within the jail.

183.    Wayne County's negligence was a factual and legal cause of Frank's injuries and death.

184.    The conduct of Wayne County falls squarely within the real property exception to governmental immunity set forth in 42 Pa.C.S. § 8542(b)(3), as Frank's injuries and death were caused by a dangerous condition of real property in the care, custody, and control of the County.

185.    As a result of the negligence of Wayne County, Plaintiff seeks recovery of:

a.    Survival damages, including conscious pain and suffering, emotional distress, and loss of life's pleasures experienced by Frank prior to death;

b.    Wrongful death damages, including loss of companionship, comfort, guidance, services, and financial support suffered by statutory beneficiaries;

c.    Funeral and burial expenses;

d.    Compensatory damages;

e.    Any other relief this Court deems just and proper.

## JURY TRIAL

Plaintiff hereby request and demand a trial by jury.

Respectfully submitted,

**STROKOVSKY, LLC**

*/s/ Dylan T. Hastings*
Dylan T. Hastings, Esquire
Attorney ID No. 321076
1650 Market Street
Suite 3600
Philadelphia, PA 19103
(p) 267-523-2876
(f) 215-501-5556
dylan@actionafterinjury.com
*Attorney for Plaintiff*

Dated: January 7, 2026